Slip Op. 07-110

UNITED STATES COURT OF INTERNATIONAL TRADE

MITTAL STEEL GALATI S.A.,
FORMERLY KNOWN AS ISPAT SIDEX
S.A.,

       Plaintiff,

       v.

UNITED STATES,

       Defendant,

IPSCO STEEL., INC.

       Defendant-Intervenor.

BEFORE: Pogue, Judge

Court No. 05-00311

**PUBLIC VERSION**

[Commerce's determination **affirmed-in-part** and **remanded-in-part**;
Plaintiff's Motion for Judgment on the Agency Record **denied**]

Decided: July 18, 2007

<u>Arent Fox Kintner Plotkin & Kahn</u> (<u>John M. Gurley</u>, <u>Nancy A.
Noonan</u>) for Plaintiff.

<u>Peter D. Keisler</u>, Assistant Attorney General; <u>Jeanne E. Davidson</u>,
Director, <u>Patricia M. McCarthy</u>, Assistant Director, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice
(<u>David F. D'Allessandris</u>, Trial Attorney) for Defendant.

<u>Schagrin Associates</u> (<u>Roger B. Schagrin</u>) for Defendant-Intervenor.

**OPINION**

**Pogue, Judge:** In this action, Plaintiff Mittal Steel Galati,

S.A. ("Mittal" or "Plaintiff") seeks judicial review of the final

results of the 2002-2003 administrative review, conducted by the

United States Commerce Department ("the Department" or "Commerce"),

of the antidumping duty order on cut-to-length carbon steel plate from Romania. See Certain Cut-to-Length Carbon Steel Plate from Romania, 70 Fed. Reg. 12,651 (Dep't Commerce March 15, 2005) (final results and final partial rescission) ("Final Results").

Mittal challenges three of Commerce's data selection decisions, all contained in the Final Results. Specifically, Mittal protests: (1) Commerce's decision to value Plaintiff's recycled iron scrap factor as a material input, instead of assigning it a value of zero or providing an appropriate offset to the assigned value; (2) Commerce's choice of a surrogate value for limestone; and (3) Commerce's rejection of data – to be used in deriving surrogate financial ratios – from the financial statements for Mittal's Algerian affiliate, Ispat Annaba. Mittal also asks the court to order the re-liquidation of subject merchandise entries that were liquidated prior to the expiration of the statutory time limit for appeal, and prior to Mittal's application for a preliminary injunction.

Pending before the court is Plaintiff's USCIT R. 56.2 motion for judgment on the agency record. For the reasons stated herein, the court remands for reconsideration Commerce's decision to value Plaintiff's recycled iron scrap factor and its choice of a surrogate value for limestone. The court affirms Commerce's rejection of the financial statement from Ispat Annaba. Further, the court declines to exercise its authority to order re-liquidation.

## Background

Mittal Steel Galati, S.A., formerly known as Ispat Sidex S.A., is the producer of certain cut-to-length carbon steel plates in Romania.  These products are covered by an antidumping duty order that was issued in 1993.  See Certain Cut-to-Length Carbon Steel Plate from Romania, 58 Fed. Reg. 44,167 (Dep't Commerce Aug. 19, 1993)(antidumping duty order).  Commerce conducted an administrative review of this antidumping duty order for entries during the period from August 1, 2002 to July 31, 2003 (the "period of review" or "POR").  See Certain Cut-to-Length Carbon Steel Plate from Romania, 69 Fed. Reg. 54,108 (Dep't Commerce Sept. 7, 2004)(preliminary results and notice of intent to rescind in part)("Preliminary Results"); see also Final Results, 70 Fed. Reg. 12,651.[1]

It is a fundamental premise of antidumping law that, in

---

[1]The antidumping duty order establishes an estimate of the antidumping duty rate (the "cash deposit" rate) that will be assessed on the goods covered by the order at the time of entry. See Decca Hospitality Furnishing LLC. v. United States, 30 CIT __, __, 427 F.Supp. 2d 1249, 1251 (2006).  As the United States antidumping duty regime is a retrospective system, the administrative review establishes the actual antidumping duty rate.  See 19 CFR § 351.212 (2006)("Unlike the systems of some other countries, the United States uses a 'retrospective' assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported."); see also Am. Signature Inc. v. United States, 31 CIT __, 477 F. Supp. 2d 1281, 1282 (2007).

establishing an antidumping duty rate (whether prospectively, as the initial cash deposit rate set during an initial antidumping investigation, or as a result of the retrospective assessment conducted during the administrative review), Commerce is charged by Section 731 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673 (2000)[2] with determining the difference between the "normal value" of the subject merchandise and the "export price" or the "constructed export price," which is the price at which the subject merchandise is sold in the United States market.  See Dorbest Ltd. v. United States, 30 CIT __, __, 462 F. Supp. 2d 1262, 1265 n.1 (2006).

For market economy countries, the "normal value" is the "price of the foreign merchandise in its country of origin, in an appropriate third country, or the foreign product's cost of production."  Id.; see 19 U.S.C. § 1677b(a).  In the case of non-market economy countries ("NME's"), due to the fact that the market does not operate based on market-determined prices or the intersection of supply and demand, the cost of the goods cannot be based upon the prices attributed to them by the selling companies. Dorbest 30 CIT at __, 462 F. Supp. 2d at 1265 n. 1; see also Magnesium Corp. of Am. v. United States, 166 F. 3d 1364, 1368 (Fed. Cir. 1999) ("[T]he prices of the goods produced in an NME are

---

[2]Further citations to the Tariff Act of 1930 are to the relevant provision in Title 19 of the U.S. Code, 2000 edition.

subject to discrepancies which distort their value.")(quoting Magnesium Corp. of Am. v. United States, 20 CIT 1092, 1095, 938 F. Supp. 885, 890 (1996).   As a result, Commerce constructs the "normal value" of goods from an NME by assigning a value to the inputs of the goods, based on the "factors of production," and extrapolating the "normal" value based on that information.[3]   The value assigned to the inputs of the goods is known as a "surrogate value" and is generally determined by identifying the cost of

---

[3] See Dorbest, 30 CIT at __, 462 F. Supp. 2d at 1265 n.1 ("the antidumping statute authorizes Commerce to approximate normal value based on the cost of producing the foreign merchandise (with a margin of profit factored in)."   In particular, the statute reads:
    (c)Nonmarket economy countries
    (1) In general
       If
       (A)the subject merchandise is exported from a
       nonmarket economy country, and
       (B) the administering authority finds that
       available information does not permit the
       normal value of the subject merchandise to be
       determined under subsection (a) of this
       section,
the administering authority shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses.   Except as provided in paragraph (2), the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

19 U.S.C. § 1677b(c).

inputs in a comparable market economy country. See 19 U.S.C. §
1677b(c); Dorbest, 30 CIT at __, 462 F. Supp. 2d at 1265 n.1. In
calculating these costs, the Statute generally requires that
Commerce seek to determine an accurate dumping margin. See
Dorbest, 30 CIT at __, 462 F. Supp 2d. at 1268 ("The term 'best
available' is one of comparison, i.e., the statute requires
Commerce to select, from the information before it, the best data
for calculating an accurate dumping margin."); see also Lasko Metal
Prods., Inc. v. United States, 43 F. 3d 1442, 1443 (Fed. Cir.
1994). To this end, in making its data choices, Commerce normally
considers the quality, specificity and contemporaneity of the data
and prefers to use public, country-wide data, where it is
available. See Goldlink Indus. Co. v. United States, 30 CIT __,
__, 431 F. Supp. 2d 1323, 1337 (2006); Freshwater Crawfish Tail
Meat from the People's Republic of China, 66 Fed. Reg. 20,634
(Dep't Commerce Apr. 24, 2001) (ffinal results and final partial
rescission), Issues and Decision Mem. (cmt. 2).

Halfway through the period of review, in the administrative
review at issue here, Commerce changed Romania's status from a non-
market to a market economy country, effective January 1, 2003.
Def.'s Mem. in Opp'n to Pl.'s Mot. for J. Upon the Agency R. 3
("Def.'s Br."). As a result Commerce determined that, for the
purposes of this administrative review, it would treat Romania as
an NME for the period from August 1 to December 31, 2003, and as a

market economy country from January 1 to July 31, 2003. Id.; see Preliminary Results, 69 Fed. Reg. at 54,108-109. Therefore, Commerce calculated a normal value using surrogate values, in addition to using the statutory market economy analysis. Mittal's challenges relate to Commerce's data choices in the calculation of the normal value for the portion of the POR for which Romania was considered by Commerce to be an NME. The court has jurisdiction over the action pursuant to 28 U.S.C. § 1581(c).

## Standard of Review

When reviewing Commerce's final determination in an administrative review under 19 U.S.C. § 1516a, the court upholds Commerce's determinations, findings, or conclusions when they are supported by substantial evidence on the record, and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). Specifically, the court reviews the agency's legal interpretation of the governing statutes--whether or not issued by formal notice-and-comment rule-making--to confirm that such interpretation is in accordance with law. See, e.g., Chevron U.S.A. Inc. v. Natural Resources Defense Council Inc., 467 U.S. 837, 842-43 (1984); Zenith Elec. Corp. v. United States, 988 F. 2d 1573, 1582 (Fed. Cir. 1993); cf. Christensen v. Harris County, 529 U.S. 576, 587(2000) (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). The agency's factual determinations are reviewed to determine whether

there is substantial evidence in the record supporting the agency's findings. Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F. 3d 1330, 1335 (Fed. Cir. 2002) Substantial evidence review requires weighing the totality of the evidence, id.,[4] to determine whether the agency's factual findings are reasonable when viewed in light of that complete record. Nippon Steel Corp. v. United States, 458 F. 3d 1345, 1351 (Fed. Cir. 2006).

## Analysis

1.  Assignment of a Surrogate Value to Mittal's Recycled Iron Scrap Input

As noted above, in calculating a normal value for goods from an NME country, Commerce assigns a surrogate value to the various inputs that are used to manufacture the subject merchandise covered by the antidumping duty order. Dorbest, 30 CIT at __, 462 F. Supp. 2d at 1265 n.1; 19 U.S.C. § 1677b(c). In order to ascertain the factors of production that were used for the subject merchandise, Commerce sends questionnaires to the exporters subject to the investigation. Def.'s Br. 3. After a verification process, Commerce then selects an appropriate surrogate value for the goods.

---

[4] "To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" Ta Chen Stainless Steel Pipe, 298 F. 3d at 1335 (quoting Atl. Sugar, Ltd. v. United States, 744 F. 2d 1556, 1562 (Fed. Cir. 1984)).

<u>Id.</u> at 3-5.

In some investigations, the remnants or by-products of one part of the production process (the cost of which is already accounted for) are re-utilized in a secondary production process. To re-value these re-cycled inputs in evaluating the costs of the secondary production could result in counting the cost of that factor of production twice.   Therefore, as a general rule, when Commerce can verify that scrap was produced from an earlier stage of the production process, and that it is utilized in a later stage of the production process, Commerce will value the scrap input at zero, and not assign a surrogate value to the scrap input.   <u>Def.'s Br.</u> 10 ("Typically, Commerce does not assign a surrogate value to recycled products because the factors used in producing the recycled by-products have already been reported.").

This general rule appears applicable to Mittal, which is a fully integrated steel mill that manufactures the subject merchandise from start to finish (that is to say from the production of coke to the production of liquid steel and then the rolling of steel slabs into the subject merchandise). Pl.'s Reply to Def.'s & Def.-Intervenor's Mem. in Opp'n to Pl.'s Mot. J. Agency R. 2-3 ("<u>Pl.'s Reply</u>").   As a result, in this administrative review, Mittal reported the factors of production used for each stage of the production process.   <u>Id.</u>   In its response to Commerce's questionnaire regarding Mittal's factors of production,

Mittal "requested Commerce <u>not</u> to value the recycled iron scrap as
the factors of production for such scrap are already part of the
integrated factors reported." Pl's Mem. of P. & A. in Supp. of its
R. 56.2 Mot. J. Agency R. 7 ("<u>Pl.'s Br.</u>") 7.  Mittal's response
stated:

> In this field we have reported the consumption of self-
> produced scrap which re-entered the production process,
> per 1 MT of heavy plate.  Scrap is introduced in the
> refractory and steel works plant to produce liquid steel.
> No surrogate value should be applied to this factor as
> the factors needed to produce the recycled scrap are
> already reported.

<u>Pl.'s Br.</u> 7 (quoting Letter from Coudert Brothers LLP to the U.S.
Department of Commerce, Case No. A-485-803 <u>Re: Certain Cut-to-
Length Steel Plate from Romania</u> (December 22, 2003), Prop. Doc. No.
569, Pl.'s App. 4 ("<u>Section D Questionnaire Response</u>") at 11.

In its Issues and Decision Memorandum for the Final Results of
the Administrative Review ("<u>Issues and Decision Mem.</u>"),[5] Commerce
announced its contrary decision to assign a value to Mittal's iron
scrap product.  Commerce explained:

> In this case, [Mittal] did not request a scrap offset,
> supply adequate documentation for the recycled scrap, or
> provide a reasonable alternative methodology to account
> for these inputs.  The burden is on the respondent to
> create an adequate record to substantiate its claim for

---

[5] Memorandum from Barbara E. Tillman to Joseph A. Spetrini,
<u>Issues and Decision Memorandum for the Final Results and Final
Partial Recission of Certain Cut-to-Length Carbon Steel Plate
from Romania</u>, Dep't Commerce (March 17, 2005), <u>available at</u>
http://ia.ita.doc.gov/frn/0503frn/E5-1127.txt.

> an offset . . . . [Mittal] has not met its burden and has
> not provided any evidence on the record to support its
> claim for an offset.

<u>Issues and Decision Mem.</u>, at 27 (Cmt. 12).

Mittal argues that by assigning a value to Mittal's scrap input, Commerce double-counts the cost of those inputs, valuing them a first time when they initially entered the production process, and then valuing them a second time when they were used as scrap product in a latter portion of the production process. Mittal claims that by double-counting the cost of these inputs, Commerce runs afoul of statutory and court strictures that require Commerce to calculate the antidumping margin as accurately as possible. See <u>Lasko</u>, 43 F. 3d at 1443.

Mittal argues that, while it is true that they did not request an offset for its iron scrap product whether the scrap input is valued at "zero" or is instead added in as a factor of production, with that value then "offset", the result is the same, <u>i.e.</u>, ultimately the scrap input is not valued. <u>Pl.'s Br.</u> 10. Mittal also argues that it has previously reported its scrap input in the same way in Commerce's investigations of similar products, covering in part the same time period, without requesting a scrap offset, and Commerce did not assign a surrogate value to Mittal's scrap input. <u>Id.</u> As an example, Mittal points to <u>Certain Hot-Rolled Carbon Steel Flat Products from Romania</u>, and the first administrative review thereof (conducted for 2002-2003). <u>Pl.'s Br.</u>

12; see Certain Hot-Rolled Carbon Steel Flat Products from Romania, 66 Fed. Reg. 49,628 (Dep't Commerce Sept. 28, 2001) (final determination); Certain Hot-Rolled Carbon Steel Flat Products From Romania, 70 Fed. Reg. 34,448 (Dep't Commerce June 14, 2005)(final results).

In the proceedings for hot-rolled carbon flat steel products from Romania, the second review of which overlaps the same time period as the proceeding under review here, Mittal claims that recycled iron scrap was valued at zero, and, as is the case here, no formal request for an offset was made. The fact that Commerce seemingly changed its methodology, without explaining the change or inconsistency, according to Plaintiff, implicates a reliance interest that companies have in a past methodology. Pl.'s Br. 14; see Böwe-Passat v. United States, 17 CIT 335, 339 (1993); Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States, 25 CIT 1150, 1169, 178 F. Supp. 2d 1305, 1327 (2001); Shikoku Chems. Corp. v. United States, 16 CIT 382, 388, 795 F. Supp. 417, 421 (1992) ("[p]rinciples of fairness prevent Commerce from changing its methodology at this late stage").

Mittal also argues that it had no opportunity to comply with any new policy that would have required it to formally request an offset, stating that Commerce's questionnaire does not include a requirement to request such a "scrap offset." Pl.'s Br. 12. Plaintiff claims that when Commerce instituted its new methodology,

Plaintiff should have had the opportunity to "address the new methodology which Commerce adopted in the Final Results." Id. at 14.

Finally, Mittal argues that, despite Commerce's assertions to the contrary, it did provide sufficient documentation to account for the amount of input used at specific stages of the production process.   In particular, Mittal points to its Section D questionnaire response and its first supplemental questionnaire response, in which Mittal stated that it reported all of the factors of production that go into the production of the subject merchandise and the recovered iron scrap. Pl.'s Br. 15; Section D Questionnaire Response, Prop. Doc. No. 569, Pl.'s App. 4 at 11; Letter from Coudert Brothers LLP to the U.S. Department of Commerce, Case No. A-485-803 Re: Certain Cut-to-Length Steel Plate from Romania (February 11, 2004), Prop. Doc. No. 611, Pl.'s App. 5 at 11, Ex. 17 ("First Supplemental Questionnaire Response"). Mittal also provided additional information to explain "an apparent discrepancy between the recycled iron scrap factors of production reported and the total scrap produced." Pl.'s Br. at 16.   See Letter from the Coudert Brothers LLP to the U.S. Department of Commerce, Case No. A-485-803 (May 17, 2004), Prop. Doc. No. 634, Pl.'s App. 14 ("Second Supplemental Questionnaire Response") at 6-7 and at Exs. 13-14.

While Commerce concedes that it "[t]ypically [] does not

assign a surrogate value to recycled products because the factors used in producing the recycled by-products have already been reported," Def.'s Br. 10, it argues that its decision in this review to assign a surrogate value to the scrap input here is supported by the record.

Commerce specifically claims that during the administrative review "Mittal Steel failed to demonstrate the amount of recycled scrap it actually produced and consumed during the production of subject merchandise." Id. at 14. Commerce states that Mittal only provided estimates of the amount of iron scrap reintroduced into the production process, did not provide any calculations of the amount of iron scrap, did not allocate the amount of scrap used in the production of subject versus non-subject merchandise, and never provided an actual amount of recycled iron scrap used in production. Id. at 14-15 (citing First Supplemental Questionnaire Response, Prop. Doc. No. 611, Pl. App. 5.  Exs. 17, 18; Second Supplemental Questionnaire Response, Prop. Doc. No. 634, Pl.'s App. 14 at 6-7 and Ex. 13-14). Additionally, Commerce points to the fact that Mittal also purchased iron scrap.  Def.'s Br. 15 (citing Section D Questionnaire Response, Prop. Doc. No. 569, Pl.'s App. 4 at 10-11.

Commerce also responds that Mittal's claim – that there is sufficient information on the record for Commerce to calculate the amount of recycled scrap used – is unavailing because, even were

Commerce able to calculate the amount of recycled scrap used by subtracting the purchased scrap from the total amount of scrap used, that calculation nonetheless would not reveal how much recycled scrap was used or allocated between subject and non-subject merchandise, and therefore provides no information as to the actual amount of such recycled scrap that was consumed in the production of the subject merchandise.[6] Def.'s Br. 16.

---

[6]Ipsco Steel, Inc., the Defendant-Intervenor, points out that "[s]crap recovered from the production of non-subject merchandise does not qualify for a scrap offset (even though it is required to be reported as an input if used in producing the subject merchandise) because the inputs used in producing this recycled scrap (i.e. the inputs used to produce the non-subject merchandise from which this recycled scrap was generated) are not reported in response to Commerce's questionnaire." Opp'n of Def.-Intervenor Ipsco Steel Inc. to Pl.'s Mem. in Supp. of its R. 56.2 Mot. J. Agency R. 8 ("Def.- Intervenor's Br.")(emphasis in original). The Defendant-Intervenor also notes the similarity of this situation to that of Non-Malleable Cast Iron Pipe Fittings from the PRC, where Commerce could not properly ascertain the source of the scrap used. Commerce did not, however, make this argument or explanation in the Issues and Decision Mem., in which it claimed that Mittal "did not . . . supply adequate documentation for the recycled scrap." Issues and Decision Mem. at 27 (cmt 12).

Defendant states, in its brief, that "Mittal Steel failed to demonstrate the amount of recycled scrap it actually produced and consumed during the production of the subject merchandise." Def.'s Br. 14 (emphasis added). Other than this statement, however, Defendant appears to be basing its argument on the lack of actual figures for the consumption of recycled iron scrap in the production of subject merchandise rather than recycled iron scrap produced during the production of subject merchandise.

In fact, Commerce claims several times in its brief that Mittal did not provide the amount of iron scrap consumed in the production of subject merchandise. Def.'s Br. 14 ("Specifically, Mittal Steel failed to demonstrate the amount of scrap it actually consumed and failed to allocate its recycled scrap over

(continued...)

Commerce further claims that the administrative determinations that Mittal cites addressing the use of the same or similar methodology, in which Commerce did not assign a surrogate value to the recycled scrap product, are of no moment.  Commerce contends that the court is foreclosed from considering the methodologies adopted in other determinations because the record data in those cases are not on the record as part of the underlying administrative proceeding at issue here.  Commerce concedes that Appendix 7, which is the Factor Valuation Memorandum for <u>Certain Hot-Rolled Steel Flat Products from Romania</u>, can be considered part of the record here, but argues that that determination is not relevant as it only indicates that in a review for a different product, recycled scrap was not valued.  <u>Def.'s Br.</u> 12.  Commerce claims that Mittal's reliance on proceedings in other reviews for other products is equally unavailing, as none of the determinations

_____

[6](...continued)
both its subject and non-subject merchandise."); <u>see also</u> <u>id.</u> at 11, 15, 16.

Mittal claims, in its Reply Brief, that "the reported self-produced iron scrap factor of production already accounts for the production of subject merchandise and not the universe of products made by [Mittal]." <u>Pl.'s Reply Br.</u> 8.  Mittal further claims that "in order to account for the liquid steel used only in the production of subject merchandise, [Mittal] adjusted the recycled scrap FOP by the yields and production of the slab caster and the plate mills." <u>Id.</u>

The court notes that there is nothing on the record that indicates that Commerce was questioning the production of the recycled iron scrap rather than its usage. Consequently, it appears that the Defendant-Intervenor's argument about the production of recycled scrap is a red herring.

to which Mittal points are for the same order. Def.'s Br. 13.[7]

Mittal counters this argument by the Defendant-Intervenor by asserting that it has reported the scrap product at the same level of specificity as all of the other materials reported. Pl.'s Reply Br. 3. Additionally, Mittal claims it calculated the contribution of recycled iron scrap to the subject merchandise, saying that the worksheets provided demonstrated the allocations of scrap in the production of subject merchandise. Mittal states that it "provided both the stage-specific input consumption and the cumulative input consumption over all of the stages of the production process for the subject merchandise." Pl.'s Reply Br. 8. It then adjusted the recycled scrap by the yields of the slab caster and the plate mills, utilizing "the same reporting methodology applied to all material inputs in this proceeding." Id.

Finally, Mittal notes that in Certain Hot-Rolled Carbon Steel Flat Products from Romania, Commerce valued recycled iron scrap at zero both in its investigation and in the first administrative

---

[7]Defendant-Intervenor also notes that there is no change in practice at all here, stating that it has long been the policy of Commerce to ascertain what portion of the scrap utilized is generated by the production of the subject merchandise (versus production of the non-subject merchandise). Def.-Intervenor's Br. 13-14. Defendant-Intervenor claims that any difference in treatment alleged by Mittal is based on a factual difference, i.e., that in cases where the offset is given, Commerce is able to ascertain what percentage of recycled scrap is generated from the subject merchandise as opposed to the non-subject merchandise, or where the respondent produces only the subject merchandise. Id.

review. Mittal claims that the integrated production processes for hot-rolled steel and steel plate are identical until the liquid steel stage (at which point the difference lies in the finishing of the products). Mittal argues that even though hot-rolled steel is not covered by the same order, it is so like the goods at issue here that Commerce's treatment of the recycled scrap input here is a departure from its previous methodology. Pl.s Br. 11-12.

The court finds it is necessary to remand this issue to Commerce. The agency's policy is that "Commerce will offset the respondent's cost of production by the value of a reported by-product where the respondent's questionnaire responses indicate that it was sold, or where the record evidence demonstrates clearly that the by-product was re-entered into the production process." Def.'s Br. 11. Here, Commerce's decision not to follow its own policy is unsupported by substantial evidence; nor did Commerce "articulate[] a rational connection between the facts found and the choices made." Celanese Chems. Ltd. v. United States, 31 CIT __, __, Slip Op. 07-16 at 38 (January 29, 2007) (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).

Construed generously, Commerce's determination gives the following reasons for providing a value to the recycled scrap: (1) Mittal never requested a scrap offset; (2) Mittal did not provide the actual amount of scrap used in manufacturing the subject merchandise; (3) there was no means of distinguishing between

recycled and purchased scrap inputs; and (4) there was no means of distinguishing between recycled scrap that had been used in the production of subject merchandise as opposed to the production of non-subject merchandise.

As for the first point, it appears that Mittal would not have known to request such an offset based on its experience in other investigations and reviews.[8]  More importantly, nowhere in the questionnaires Mittal received (which it received prior to the issuance of the <u>Preliminary Results</u>) was there any indication that Mittal was required to ask for an offset in order for the recycled scrap not to receive a value.

As for Commerce's remaining points, the evidence on the record demonstrates the contrary.  Specifically, the evidence on the

---

[8]<u>See</u> Memorandum from Christopher Riker to Gary Tavermen <u>Re: Preliminary Determination of Sales at Less than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products from Romania</u>, Dept' Commerce (April 23, 2001), Prop. Doc. 735 at Ex. 10, Pl.'s App. 7 at 2 (showing that recycled iron scrap for the same producer for a product with a similar production process was not valued) . Commerce argues before the court that the court should not take into account the <u>Final Factors Valuation Memo</u> in the 2002-2003 Administrative Review of <u>Certain Hot-Rolled Carbon Steel Flat Products from Romania</u>, (Dep't Commerce June 6, 2005) or from the <u>Preliminary Factors Valuation Memo.</u> in the 2002-2003 Administrative Review of <u>Certain Hot-Rolled Carbon Steel Flat Products from Romania</u>, (Dep't Commerce Nov. 29, 2004), as these were not part of the record of the proceeding.  The court notes that these are all documents that are part of the public record, involving the same parties and a similar product, and would be of relevance in deciding whether or not Commerce had a different prior past practice.  However, the court need not consider the documents that were not part of the administrative record of this proceeding in order to decide this issue.

record    demonstrates    that    Mittal    provided    specific    usage

calculations for recycled scrap product on a per Metric Ton basis.[9]

This information was provided for the subject merchandise produced.

Mittal provided a worksheet that indicated the consumption, by

kilogram per metric ton, for the various inputs used to calculate

the subject merchandise.   See Second Supplemental Questionnaire

Response, Prop. Doc. No. 634, Pl.'s App. 14 at Ex. 14.   This table

provides a break-out used for Iron Scrap Recycled and Iron Scrap

---

[9]In responding to the questionnaire, Mittal stated:

Exhibit 17 of [Mittal's] February 10, 2004 supplemental
response contained (a) the step-by-step detailed
explanation of how [Mittal] derived the recycled scrap
FOP (the Recycled Iron Scrap FOP Worksheet) and (b) a
worksheet with monthly scrap consumptions for each of
BOF1 and BOF3.  A revised version of Exhibit 17 of
[Mittal's] February 10, 2004, supplemental response,
containing minor corrections, is attached at Exhibit 13
of this response.

See also id. at Ex. 13,("The specific consumption of recycled
iron scrap at BOF1 for the production of 1 MT of liquid steel was
derived as follows...").
        Defendant-Intervenor contends that while Mittal reported
factor data based on only inputs that entered the blast furnaces
that produced the subject inputs, the scrap was recovered from
multiple sources including the finishing of non-subject
merchandise.  Def. Intervenor's Br. 11. Mittal refutes this point
by stating that it uses the same means of reporting recycled iron
scrap as any other input, by adjusting the recycled scrap factor
of production by "the yields and production of the slab caster
and the plate mills" in order to calculate the contribution of
recycled iron scrap to subject merchandise. Pl.'s Reply Br. 8.
Mittal further explained that "[t]he reporting of all of the
material inputs that went into the production of steel slab,
including the recycled iron scrap, was adjusted to reflect only
the slab corresponding to the cost groups used to manufacture the
subject merchandise." Id. at 3-4.

Purchased used in the manufacture of subject merchandise. Commerce's decision is therefore inconsistent with the record.  To say that Mittal's table does not "document" the recycled scrap entering into the production of subject merchandise, or that this submission is not an appropriate allocation methodology, is therefore to say that none of the factors of production reported by Mittal were allocated properly between subject and non-subject merchandise. But Commerce makes no such claim.  On the contrary, Commerce accepted Mittal's filings for other factors.  <u>See</u> Memorandum from Ann Barnett-Dahl and Brandon Farlander, Case Analysts, to Richard Weible, Office Director, Office VII <u>Re: Preliminary Results of Review: Certain Cut-to-Length Carbon Steel Plate from Romania; Factors of Production Valuation Memorandum for the Preliminary Results</u>, (Dep't Commerce Aug. 30, 2004), Prop. Doc. No. 698, Pl.'s App. 3 at Attach. 1 ("<u>Factors Valuation Mem.</u>"). Thus Commerce relies on the fact that Mittal did not provide data that was, in fact, on the record. Consequently, Commerce's determination not to value the recycled iron scrap as zero is not supported by substantial evidence. On remand, Commerce must review Mittal's filings and address specifically their sufficiency for making the required calculations.


## 2. <u>Commerce's choice of Surrogate Value for Limestone</u>

When choosing surrogate values during an investigation or

administrative review, Commerce selects a country that, to the extent practicable, will be the source of data to value the individual factors of production. <u>See</u> 19 U.S.C. § 1677b(c)(1)&(4); 19 C.F.R. § 351.408(c)(1) & (2)[10]; <u>see also Dorbest</u>, 30 CIT at __, 462 F. Supp. 2d at 1270. For this administrative review, Commerce determined that "Egypt, Algeria, and the Philippines (1) are comparable to Romania in its level of economic development, and (2) are significant producers of comparable merchandise" and therefore would be acceptable surrogate countries. <u>Preliminary Results</u>, 69 Fed. Reg. at 54,113. From those countries, Commerce then chose Egypt as its surrogate country for this investigation.[11] <u>Id.</u> For valuing limestone, however, Commerce calculated a surrogate value using import data from the Philippines from 2001.

After the issuance of the <u>Preliminary Results</u> and prior to the issuance of the <u>Final Results</u>, Mittal argued that Commerce's selection of Filipino import data was not appropriate because the data was aberrational. Mittal argued that Commerce should instead use Mittal's own 2003 purchase price, from the latter half of the Period of Review, during which Commerce classified Romania as a market economy country, as a surrogate value for limestone.

In the <u>Issues and Decision Mem.</u>, Commerce declined to change

---

[10]All references to the Code of Federal Regulations are to the 2006 edition.

[11] No party challenges this choice.

its surrogate value for limestone,[12] stating that it could not use

Mittal's own information, as that information was proprietary and

therefore did not meet the criteria that Commerce has established

for selecting surrogate values.  Issues and Decision Mem. at 26

(cmt 11). Commerce further stated, with respect to aberrational

data, that it

> examined, where applicable, 2002 data from the countries
> on the surrogate country list and [Commerce was] unable
> to find data that was not aberrational. [Commerce]
> repeated this process for 2001 data and [Commerce] found
> the 2001 Philippines limestone data to be non-
> aberrational.

Issues and Decision Mem., at 24 (cmt 11).

Before the court, Mittal again  challenges the selection of

the Filipino import data stating that the selection of this

surrogate value contravenes the statutory directive that Commerce

is to "value the factors of production 'based on the best available

information regarding the values of such factors in a market

economy country or countries considered to be appropriate by

[Commerce].'"   Pl.'s   Br.   24   (citing   19   U.S.C.

§ 1677b(c)(1)(B)(2000)).  Mittal avers that there is other non-

aberrational data on the record that satisfies the statutory

objective of being the "best available information."  Mittal also

_____

[12]Commerce selected 2001 Filipino import data that valued
limestone at $0.07/kg. Factors Valuation Mem. at 4.  With
adjustments for inflation and converted to Metric Tons ("MT"),
this is equivalent to an adjusted price per MT of $77.45.  Id.

claims that the choice of Filipino data is not supported by substantial evidence due to the fact that the Filipino data selected is aberrational.

Mittal supports its assertion that the Filipino limestone data is aberrational by pointing to (1) the fact that the data selected is based on very low import volumes (contrary to Commerce's preferred practice),[13,14] and (2) the data selected is ten times

_____

[13]Specifically, Plaintiff points to the fact that the 2001 data from the Philippines was based on import data with a value of $6000.  Letter from Coudert Brothers LLP to the U.S. Department of Commerce, Case No. A-485-803 Re: Certain Cut-to-Length Steel Plate from Romania (October 18, 2004), Prop. Doc. No. 735,  Pl.'s App. 12 at 54 ("Pl.'s Case Br.") (citing Factors Valuation Mem. at 4)).  Additionally, Plaintiff claims that this import data was based on imports from the United States.  Id.

[14] Plaintiff cites to several of Commerce's previous investigations of other products, where Commerce rejected surrogate data which are based on low levels of imports.  In particular, Plaintiff references Steel Concrete Reinforcing Bars from Belarus 66 Fed. Reg. 33,528 (Dep't Commerce June 22, 2001)(final determination)(Issues and Decision Memorandum at 4 (cmt. 1) available at http://ia.ita.doc.gov/frn/summary/belarus/01-15743-1.txt (rejecting a surrogate value, Commerce states that it "[does] not believe that a value that differs significantly from both the Thai and U.S. values for the same input and is based on import data primarily from one country, and in relatively low quantities, is a representative or reliable value to use as a surrogate value in [Commerce's] calculations"); Silicon Metal from the Russian Federation, 68 Fed. Reg. 6885 (Dep't Commerce Feb. 11, 2003) (final determination) (Issues and Decision Memorandum at 20 (cmt. 5)) available at http://ia.ita.doc.gov/frn/summary/russia/03-3408-1.pdf (excluding low volume imports when the per unit values were substantially different than the per unit values of the larger quantities of the import on the record).  See Pl.'s Case Brief, Prop. Doc. No. 735, Pl.'s App. 12 at 54.

higher than the benchmark data provided on the record.  Pl.'s Br. 25.

The chart below demonstrates the range of prices for limestone that Plaintiff has placed on the record for the POR:

Limestone Import Prices in dollars per kg
(for POR unless otherwise noted)

| Commerce's selection (2001) | U.S. Data[15] | E.U.   data | El Salvador data | Polish data | Albanian data | Peak actual price (half of POR) |
|---|---|---|---|---|---|---|
| 0.07 | 0.006 | <0.015 | 0.054 | 0.007 | 0.02 | [        ][16] |

Pl.'s Br. 26; see also Pl.'s Case Br., Prop. Doc. No. 735, Pl.'s App. 12 at 55-56; Letter from the Coudert Brothers LLP to the U.S. Department of Commerce, Case No. A-485-803 (October 8, 2004), Prop. Doc. No. 733, Pl.'s App. 14 at Ex. 4.[17]

Mittal also notes that Commerce's choice of data from the

---

[15] In its Brief before the court, and in its case brief before Commerce, Plaintiff listed the U.S. import price for limestone data as $0.006/MT.  Pl.'s Br. 26; Pl.'s Case Br., Prop. Doc. No. 735, Pl.'s App. 12 at 55.  A further examination of the record, however, reveals that the correct unit of measurement is $0.006/kg.  Letter from Coudert Brothers LLP to the U.S. Department of Commerce, Case No. A-485-803 Re: Certain Cut-to-Length Steel Plate from Romania (August 3, 2004) Pl.'s App. 18 at Ex.3.

[16] This is Plaintiff's proprietary data.  It is substantially less than Commerce's selection.

[17]Plaintiff hypothesizes that the high value of the Filipino import data is based on the low volume of that data, the fact that the imports came from the United States, and the fact that the category used to select the imports was a basket category of goods, and therefore was not specific enough to obtain the particular limestone input utilized by Mittal.  Pl.'s Br. 27-28.

Philippines is contrary to case law directing that Commerce "be consistent in applying benchmark variations to determine which values are aberrational." Pl.s' Br. 28 (citing Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 29 CIT __ , __, Slip Op. 04-88 at 21-22 (July 19, 2004).   More specifically, Mittal notes that, in the instant administrative review before the court, Commerce itself declined to use Algerian data that was based on imports worth $7,720, and having a value ten times other surrogate data on the record for the same input.  Pl.'s Br. 28; see Issues and Decision Mem. at 14-15 (cmt. 6).

In response to Mittal's challenges to the Filipino data selected, Commerce explained that its procedures led to the selection of Egypt as Commerce's primary surrogate country, and therefore as its primary choice for surrogate data.  When data from Egypt was unavailable or unusable, Commerce sought data from other economically comparable countries that were also significant producers of comparable merchandise--here the Philippines and Algeria--in its search for appropriate surrogate value information. Commerce claims that it chose the Filipino data because

> the 2002 data from the WTA [World Trade Atlas] were
> aberrational or non-existent for Egypt, the
> Philippines, and Algeria, as were the 2001 data from
> Egypt and Algeria.  Commerce found that these import
> prices were unreasonably high priced, except for the
> 2001 Filipino data.

Def.'s Br. 18 (citing Factors Valuation Mem., Prop. Doc. No. 698,

Pl.'s App. 3 at 4).

While, Commerce "agree[s] that 'aberrational' surrogate input values should be disregarded"[18] and that its practice is "to disregard small-quantity import data when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other countries,"[19] Commerce argues that it adjusted the Filipino import data to account for any aberrations. Def.'s Br. 20. Of all the available limestone data from all the surrogate countries, Commerce argues that the Filipino import data was the most reasonable choice, warts and all, within the universe of choices.

The court remands this issue to Commerce for further explanation in light of the data placed on the record that demonstrates that the limestone value that Commerce selected was much higher than the value of limestone imported in other countries and applied to a small volume of imports. See Shakeproof Assembly, 23 CIT at 485, 59 F. Supp. 2d at 1359-60; see also Shanghai Foreign Trade Enters. v. United States, 28 CIT __, __ , 318 F. Supp 2d

_____

[18]Def.'s Br. 19 (quoting Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27296, 27366 (Dep't Commerce May 19, 1997)(final rule).

[19]Def.'s Br. 19 (quoting Heavy Forged Hand Tools from the People's Republic of China, 62 Fed. Reg. 11,813 (Dep't Commerce March 13, 1997)(final results); citing Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United States, 23 CIT 479,485, 59 F. Supp. 2d 1354, 1360 (1999).

1339, 1353 (2004) <u>Hebei Metals & Minerals</u>, 28 CIT at __, Slip Op. 04-88 at 21-22.

In the cases cited above, Commerce excluded import statistics where the import value was aberrational and the import values low, and when alternative import statistics included imports from several countries.  In this administrative review, as noted above, Commerce excluded data from Algeria based on this principle.  <u>Pl.'s Br.</u> 29; <u>Issues and Decision Mem.</u> at 14-15 (cmt 6).[20]

When confronted with a colorable claim that the data that Commerce is considering is aberrational, Commerce must examine the data and provide a reasoned explanation as to why the data it chooses is reliable and non-distortive.  <u>See</u> <u>Dorbest</u>, 30 CIT at __, 462 F. Supp. 2d at 1287-88.  Here, confronted with data that indicates that Commerce chose low volume, aberrational data, Commerce did not evaluate the data on the record in comparison to benchmarks, but instead relied only on the claim that the data selected was better than other data from the acceptable surrogate countries.  As such, Commerce's decision skips over Mittal's claim that the Filipino data is outside Commerce's own standard of acceptability, and thus avoids an important aspect of the problem

---

[20]Even in using the Filipino data, Commerce made adjustments, eliminating data from Spain, because Commerce found that data to be aberrational.  <u>Factor Valuation Memo.</u>, Prop. Doc. No. 698, Pl.'s App. 3 at 4.

presented. Motor Vehicle Mfrs. Assn. v. State Farm Mut., 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious where it fails to consider an important aspect of the problem).

Commerce effectively claims that it chose the Filipino import data due to a process of elimination.  While Commerce argues that this is its best choice within its universe of choices, Commerce has not explained, why, given the benchmark data (which is plentiful and remarkably consistent), it found the 2001 Filipino import data to be reliable and non-aberrational.  If the Filipino data which meets Commerce's surrogate criteria nonetheless proves to be unusable, or demonstrably aberrational, Commerce should examine data sources that it has outside of those from the surrogate countries.  Cf. Dorbest, 30 CIT at __, 462 F. Supp 2d at 1280-81 (noting that Commerce's desire for contemporaneity might be trumped if data that is non-contemporaneous is otherwise accurate).

On this record, Mittal has provided several options for surrogate values for limestone.  Commerce has rejected the U.S. and the EU data because Commerce's practice is "'to only resort to data from countries not on the surrogate country list' such as the United States and the European Union, where Commerce 'cannot identify surrogate value data from any country on the surrogate country list that is a significant producer of comparable merchandise.'" Def.'s Br. 20 (quoting the Issues and Decision Mem., 26 (cmt. 11)).  While Commerce has every right to prefer data from

economically comparable countries, Commerce cannot meet its
statutory objective to use the best available information, or to
obtain the most accurate margin possible, by relying on
aberrational data for the sole reason that it comes from a country
that is on the surrogate country list.  See Globe Metallurgical,
Inc. v. United States, 28 CIT __, 350 F. Supp. 2d 1148, 1160
(2004)("Commerce will disregard values from the primary surrogate
country when it finds those values to be (1) unavailable; (2) not
sufficiently contemporaneous; (3) of poor quality, or (4) otherwise
unreliable, i.e., aberrational." (internal citation omitted)).  As
Commerce itself recognizes, it does not use surrogate country data
that is aberrational.   Id.; Antidumping Duties; Countervailing
Duties, 62 Fed. Reg. at 27366; Shakeproof Assembly, 23 CIT at 485,
59 F. Supp. 2d at 1359-60.

In addition, Commerce's analysis of its alternatives is
incomplete.  Commerce declined to use Mittal's own data on the
basis that this data consists of proprietary information.  Def.'s
Br. 21; Issues and Decision Mem., at 26 (cmt. 11).  But the
argument against using proprietary information does not apply when
it is the respondent's own information that is at issue.  Commerce
is using the respondent's proprietary information throughout its
investigation or review, when relying on the respondent's reporting
of factors of production.  Indeed, Commerce's own regulations
provide for the usage of respondent's own information in a non-

market economy situation, when a factor is purchased from a market-economy supplier.   19 C.F.R. § 351.408(c)(1).[21]  Accordingly, Commerce should reconsider this rationale.

Commerce also claims that it cannot use the Mittal data because that data is outside the period of review.  However, the Filipino data is also outside the period of review, though adjusted.  Consequently, Commerce appears to apply its standards in an arbitrary fashion.  See Shanghai Foreign Trade Enters., 28 CIT at __, 318 F. Supp. 2d at 1352 (Commerce's determination was not supported by substantial evidence when "Commerce summarily discarded the alternatives as flawed but did not evaluate the reliability of its own choice.").  The fact that Commerce was willing to rely on Filipino data that were outside the period of review indicates that data from outside the period of review is not automatically disqualified.

Finally, Commerce relies on its preference for "country-wide, publicly available data."    Def.'s Br. 21-22.   Invoking this

---

[21]Commerce's regulation reads:

(1)Information used to value factors.
The Secretary normally will use publicly available
information to value factors.  However, where a factor
is purchased from a market economy supplier and paid
for in a market economy currency, the Secretary
normally will use the price paid to the market economy
supplier. . . .

19 C.F.R. § 351.408(c)(1).

general policy preference, however, does not appear to be logical here.  It is of course reasonable that Commerce establish conditions and criteria in order to help ensure that it has accurate and reliable data.  It confounds the issue, however, if Commerce rejects a company's own actual price paid, during a period when that country is considered part of a market economy country, on the basis that the price is non-representative of the entire country.

Commerce's task is to duplicate, to the best of its ability, the prices a company would pay for its inputs were that company functioning in a market economy country.  19 U.S.C. § 1677b(c).  When Commerce accepts the value of the subject merchandise as the normal value in a market economy country,[22] it implicitly accepts the price paid for the inputs as accurate and the true price paid by the respondent.  It therefore appears irrational to accept that these values are the true prices paid by a company on the one hand, and then to simultaneously reject them because they are not publicly available information that is country-wide.  Therefore,

---

[22]See Preliminary Results, 69 Fed. Reg. at 54,115 (after determining that the amount of sales in Romania were sufficient to base the value on Romanian sales, Commerce "based the determination of [Normal Value] upon the [Home Market] sales of the foreign like product.  Thus, [Commerce] used as [Normal Value] the prices at which the foreign like product was first sold for consumption in Romania, in the usual commercial quantities, in the ordinary course of trade, and, to the extent possible, at the same level of trade (LOT) as the [Export Price] or [Constructed Export Price] sales, as appropriate . . . .").

this issue is remanded.  On remand, Commerce shall reconsider its position in light of the benchmark data on the record.


3.   Commerce's Rejection of Ispat Annaba Financial Statements to determine SG&A ratios

When Commerce is constructing the normal value for a respondent in a non-market economy country, Commerce must also take into account those costs that are not covered by the factors of production (the physical inputs and the wages of the workers directly involved in the manufacturing process).  "Because firms have 'general expenses and profits' not traceable to a specific product, in order to capture these expenses and profits, Commerce must factor (1) factory overhead ('overhead'), (2) selling, general and administrative expenses ('SG&A'), and (3) profit into the calculation of normal value." Dorbest, 30 CIT at __, 462 F. Supp. 2d at 1300; see 19 U.S.C. § 1677b(c)(1).  In order to capture these costs, Commerce relies upon financial statements from one or more companies based in the primary surrogate country (or other surrogate countries if need be) to create financial ratios that Commerce then applies to its factors for production data in order to recreate the full expenses of the respondent. Dorbest, 30 CIT at __, 462 F. Supp. 2d at 1300-1.

In the Preliminary Results, Commerce selected Egyptian Iron and Steel ("EIS") as its surrogate producer.  After the publication

of the <u>Preliminary Results</u>, Mittal challenged Commerce's choice of the financial statements from Egyptian Iron and Steel ("EIS") to calculate the SG&A ratios, and argued that instead Commerce should use the financial statement for an Algerian company (a Mittal Steel affiliate), Ispat Annaba.  Mittal argued that Ispat Annaba's financial statement met Commerce's own criteria for a surrogate producer because it is "reliable, contemporaneous with the POR, contains a detailed break-out of expense categories, earned a profit, and operates under common management principles."  <u>Issues and Decision Mem.</u>, at 17 (cmt. 10).

Mittal also identified a range of problems with EIS's data, and stated that if Commerce chose to continue to use Egyptian surrogate data, the agency should use data from another Egyptian company, Alexandria National Iron and Steel ("AIS").  <u>Id.</u> at 20 (cmt. 10).  Additionally, Commerce had initially supplemented EIS's financial statements with those from three different sources. Mittal claimed that if Commerce insisted on supplementing the data from EIS or AIS with those of companies from non-surrogate countries, they should use manufacturers based in Indonesia, and suggested the financial statement of PT Jaya Pari Steel Tbk ("Jaya Pari").  <u>Id.</u> at 22 (cmt. 10).

Commerce selected the financial statement from AIS, but also supplemented AIS' data with those of Jaya Pari, in order to calculate non-depreciation overhead.  <u>Issues and Decision Mem.</u>,

at 22-24 (cmt. 10). Commerce declined to used the financial

statement from Ispat Annaba stating that:

> [b]ecause [Mittal] is affiliated with Ispat Annaba, the
> Department determines that there is a potential conflict
> in that Ispat Annaba's financial statement is more likely
> to be manipulated and is therefore less preferable than
> non-affiliated companies' financial statements.  In
> contrast, while AIS is not an integrated steel producer,
> like [Mittal] (or Ispat Annaba), it is not affiliated
> with [Mittal] and is an Egyptian producer of comparable
> merchandise.

Id. at 23 (internal citations omitted).

Mittal challenges Commerce's rejection of the financial

statements from Ispat Annaba, claiming that Commerce's decision was

not supported by any data on the record, that affiliation is not a

statutory test to qualify or disqualify producers, and finally,

that the financial data from Ispat Annaba represents the best

surrogate value data on record.  Pl.'s Br. 30.

To support its claim that there is insufficient evidence on

the record of data manipulation, Mittal cites case law indicating

that Commerce's data choice must be based on record evidence and

not on speculation. See Anshan Iron & Steel Co. v. United States,

28 CIT __, __ , 358 F. Supp.2d 1236, 1241 n.2 (2004)(quoting

Asociacion Colombiana de Exportadores de Flores v. United States,

13 CIT 13, 15, 704 F. Supp. 1114, 1117, (1989)("Speculation is not

support for a finding. . . .")).

Mittal also points to instances in which affiliated companies

were used to determine surrogate financial ratios in an antidumping

investigation or administrative review involving an NME.   See Certain Ball Bearings and Parts Thereof From the People's Republic of China, 68 Fed. Reg. 10,685 (Dep't Commerce Mar. 6, 2003) (final determination) (Issues and Decision Mem. at 18-22 (cmt. 1H) available at http://ia.ita.doc.gov/frn/summary/prc/03-5300-1.pdf.[23]

Finally, Mittal argues that the data from Ispat Annaba is the best available as it is from one of the countries from Commerce's surrogate country list (Algeria), contemporaneous with the POR, audited, publicly available, and from producers that manufacture similar merchandise.   While these characteristics also describe AIS, Mittal argues that Ispat Annaba is the superior data source because the financial statements from Ispat Annaba provide a break-out of non-depreciation overhead items, and Ispat Annaba is at the same level of integration as Mittal (whereas AIS is not).   Mittal notes that in previous investigations or reviews, Commerce has viewed the level of integration to be a relevant factor for consideration because "an integrated producer will likely have greater overhead (particularly depreciation expense) because of its more expensive equipment. . . ."   Pl.s' Br. 35, (quoting Ball

---

[23]In the cited case, the financial statements were prepared after the petition was filed, and respondents chose which financial statements to place on the record.   Commerce used the data because there was no evidence of "any accounting irregularities or improper adjustments."   Certain Ball Bearings and Parts Thereof From the People's Republic of China, 68 Fed. Reg. 10,685(Issues and Decision Mem. at 18-22)(cmt.1H)).

<u>Bearings and Parts Thereof From the People's Republic of China</u>, 68

Fed. Reg. 10,685(Issues and Decision Mem. at 15 (cmt. 1F)).[24]

Commerce admits that AIS is not a fully integrated steel

producer. <u>Def.'s Br.</u> 24. <u>See also</u> <u>Issues and Decision Mem.</u> at 23

(Cmt. 10). It also notes that it had to supplement AIS'

information with a non-depreciation overhead financial ratio taken

from Jaya Pari's financial statement. <u>Def.'s Br.</u> 23. Commerce

states, however, that the information from Ispat Annaba also had to

be supplemented.

Commerce notes that, in this administrative review, the agency

was faced with a choice between a manufacturer that was not fully

integrated,[25] and one that was fully integrated but affiliated.

---

[24]Defendant-Intervenor points out that following the logic
of Plaintiff's argument here would lead to an implication "that
the AIS statements <u>understate</u> manufacturing overhead because AIS
is less integrated than [Mittal]." <u>Def.-Intervenor's Br.</u> at 27
(emphasis in the original). Therefore, "it does not logically
follow that Commerce overstated factory overhead by selecting
AIS's financial data over that of Ispat Annaba." <u>Id.</u>

[25]Defendant-Intervenor notes that while AIS is not a fully-
integrated producer, it does "engage[] in substantial
manufacturing processes involved in producing the subject steel
plate." <u>Def.-Intervenor's Br.</u> 26. Commerce noted in its <u>Issues
and Decision Mem.</u> that:

> AIS has a direct reduction plant for producing direct
> reduced iron and produces steel in electric arc
> furnaces. <u>See</u> <u>Iron and Steel Works of the World</u>, 15th
> edition(2002). However, AIS is not an integrated steel
> producer because it does not produce pig iron in a
> blast furnace or steel in a basic oxygen furnace.

(continued...)

Commerce has previously stated its preference for information that is not provided by affiliates of interested parties in the proceeding. Def.'s Br. 25; see Certain Cased Pencils from the People's Republic of China, 67 Fed. Reg. 48,612 (Dep't Commerce July 25, 2002)(final results and partial rescission)(Issues and Decision Mem. at 13 (cmt. 4)) available at http://ia.ita.doc.gov/frn/summary/prc/02-18856-1.pdf; see also Kaiyuan Group Corp. v. United States, 28 CIT __, __, 343 F. Supp. 2d 1289, 1314 (2004)(affirming Commerce's determination not to utilize surrogate values placed on the record by a party affiliate).

Regarding Mittal's claim that there was no evidence of accounting irregularities in the Ispat Annaba data, and that Commerce has accepted affiliate data in the past,[26] Commerce notes

---

[25](...continued)
Issues and Decision Mem. at 23 (cmt. 10).

[26]Defendant-Intervenor also notes that in the case referenced by Mittal as standing for the proposition that affiliate data can be used to determine surrogate values, Ball Bearings, "Commerce was able to corroborate the financial statements from affiliated parties with financial statements from unaffiliated parties." Def.-Intervenor's Brief 24 (citing Certain Hot-Rolled Carbon Steel Flat Products from Romania, 70 Fed. Reg. 34,448 (Dep't Commerce June 14, 2005)(final determination) (Issues and Decision Mem. at 38-39 (cmt. 7)) available at http://ia.ita.doc.gov/frn/summary/romania/E5-3067-1.pdf. Therefore, the data in that case was not solely from affiliated companies, nor was additional break-out data needed; accordingly, the case is not analogous to the case here.

that the financial statements provided by Ispat Annaba did not include a cost break-out.  In order for the financial statements to be of use in this investigation, Mittal obtained cost break-out information from Ispat Annaba's accountant, and did so solely for use in this administrative review.  Def.'s Br. 25-26; Letter from the Coudert Brothers LLP to the U.S. Department of Commerce, Case No. A-485-803 (May 17, 2004), Pub. Doc. No. 128, Def.'s App. Tab 10 at 5-6.  Commerce viewed this extra information, obtained solely for this proceeding and apparently not prepared in the ordinary course of business, to qualify as an "accounting irregularity."

Therefore, Commerce maintains, it was reasonable to choose the non-fully-integrated producer over the data provided by Mittal's affiliate.

The Court affirms Commerce's decision not to use Ispat Annaba's financial statements in calculating surrogate financial ratios.  Commerce had a choice between two imperfect financial statements.  It was within the agency's statutory authority to choose to use non-affiliated data when some of the information provided was obtained specifically for this proceeding, and was therefore produced in circumstances providing a significant opportunity for data-manipulation.

While Mittal correctly argues that there is no statutory requirement that the data come from non-affiliated companies, it does not argue, nor can it, that Commerce does not have the

discretion to determine that it does not want to use affiliated data when such data has "accounting irregularities."

Mittal argues that Commerce here is engaged in mere speculation, and as such, Commerce's determination cannot be deemed to be supported by substantial evidence. In this case, however, Commerce has more than a mere conjecture. Ispat Annaba's financial statements were not complete; in order for them to be completed, additional information had to be specifically compiled, outside of the ordinary course of business, and Commerce could not ascertain that from where the data was derived. Moreover, Commerce did have an alternate source of data which it deemed more reliable under the circumstances.

Where Commerce is confronted with two alternatives(both of which have their good and bad qualities), and Commerce has a preferred alternative, the court will not second-guess Commerce's choice. See Luoyang Bearing Factory v. United States, 27 CIT 1638, 1644, 288 F. Supp. 2d 1369, 1375 (2003); Dorbest, 30 CIT at __, 462 F. Supp. 2d 1289-90; see also Goldlink Indus. Co. v. United States, 30 CIT __, __, 431 F. Supp. 2d 1323, 1327 (2006)("The Court's role in the case at bar is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.") (citation omitted). Here, a reasonable mind could conclude that Commerce chose the best

available information in selecting between the two choices in front

of it.  As such, Commerce's decision was supported by substantial

evidence.


4.   <u>Commerce's Adoption and Application of a 15 Day Liquidation
     Instruction Policy</u>

     Commerce completes its administrative review of antidumping

duty orders by publishing its final results in the Federal

Register.   These results include notice that liquidation

instructions will be issued to Customs within 15 days of

publication (Commerce's "15 Day Policy").  Commerce's 15 Day Policy

states:

> The Department of Commerce announces that, effective
> immediately, it intends to issue liquidation instructions
> pursuant to administrative reviews conducted under
> section 751 of the Tariff Act of 1930, as amended, [19
> U.S.C. § 1675] to the U.S. Customs Service within 15 days
> of publication of the final results of review in the
> <u>Federal Register</u> or any amendments thereto.  This
> announcement applies to reviews conducted under sections
> 751(a)(1) and (2) of the Tariff Act.

<u>Int'l Trade Comm'n, Dep't of Commerce, Announcement Concerning</u>

<u>Issuance of Liquidation Instructions Reflecting Results of</u>

<u>Administrative Reviews</u> (August 9, 2002), <u>available at</u>

http://ia.ita.doc.gov/download/liquidation-announcement.html.

     The relevant provisions in 19 U.S.C. § 1675 require, at

subparagraph (a)(3)(C), that the "administering authority," in this

case Commerce, "issue [liquidation] instructions to the Customs

Service. . . ," and, at (a)(3)(B), that "any liquidation...pursuant
to a review...shall be made promptly and, to the greatest extent
practicable, within 90 days after the instructions to Customs are
issued." 19 U.S.C. § 1675(a)(3)(B)&(C).  The statutory provisions
do not explicitly indicate how or when the liquidation instructions
should be transmitted from Commerce to Customs; accordingly, there
is a statutory gap that the agency must fill.  See Mittal Steel
Galati S.A. v. United States, 31 CIT __, Slip Op. 2007-73 at 14
(May 14, 2007).

At the same time, the statute provides that in order to appeal
from an administrative review to the United States Court of
International Trade, a party has thirty days to file "a summons,
and within thirty days thereafter a complaint."  19 U.S.C.
§ 1516a(a)(2)(A)(ii).  Rule 56.2 of the United States Court of
International Trade allows another thirty days after the service of
the complaint during which the party may file a motion for a
preliminary injunction to enjoin liquidation of the subject entries
during the process of judicial review. USCIT R. 56.2.

In the matter in dispute here, Commerce notified the
Plaintiff, through publication in the Federal Register, that it
intended to issue liquidation instructions for Plaintiff's entries
within 15 days after publication of the Final Results.  Final
Results, 70 Fed. Reg. at 12,653.  Thereafter, Commerce actually
issued the liquidation instructions 23 days after publication of

the Final Results.  Liquidation of some of Mittal's subject entries occurred 22 days after the instructions issued, or 45 days after publication of the Final Results.

Mittal challenges Commerce's 15 Day Policy, arguing that the Policy undermines its right of judicial review, citing the 90-day period initiated by 19 U.S.C. § 1516a(a)(2)(A)(i)(I).  Mittal also cites the court's decision in Tianjin Machinery Import & Export Corp. v. United States for the proposition that the 15 Day Policy directly contravenes the statutory framework established in 19 U.S.C. § 1516a(a)(2)(A)(i)(I).  Tianjin Mach. Imp. & Exp. Corp. v. United States, 28 CIT __, 353 F. Supp. 2d 1294 (2004). Effectively, Mittal claims that its option to appeal Commerce's decision should constrain Commerce's choice of a time period for issuing liquidation instructions to Customs.  But see Mukand Int'l, Ltd. v. United States, 30 CIT __, __, 452 F. Supp. 2d 1329, 1334-35 (2006)(finding that the 15 Day Policy was a reasonable and acceptable means of statutory gap-filling); see also Mittal Steel Galati, 31 CIT at __, Slip Op. 2007-73 at 14.

Mittal claims injury because liquidations are effectively final.  See United States v. Utex Int'l Inc., 857 F.2d 1408, 1409-1410 (1988).  Mittal notes that the injunction against liquidation in this matter took effect after several entries had been liquidated, and that those liquidations occurred while Mittal was negotiating with counsel for the Defendant the terms of the

injunction. Mittal argues that decisions of the Federal Circuit indicate that a party should not suffer injury from premature liquidations when it has exercised its rights in a timely manner. See Mukand Int'l, Ltd. v. United States, No. 06-1259, 2007 WL 571026 (Fed. Cir. Feb. 6, 2007) (comparing the plaintiff's untimely actions with timely actions of the plaintiff in Shinyei); see also Shinyei Corp. of Am. v. United States, 355 F. 3d 1297 (Fed. Cir. 2004).

Commerce claims that it has a statutory obligation to order liquidation instructions unless enjoined from doing so. 19 U.S.C. § 1675(a)(3)(B)-(C); 19 U.S.C. § 1516a(c)(1). While the statute does not specify a time frame for liquidation itself, unless enjoined, entries subject to an antidumping duty administrative review that remain unliquidated on the six-month anniversary of the Federal Register publication date are deemed liquidated at the rate asserted at the time of entry. Int'l Trading Co. v. United States, 412 F. 3d 1303, 1313 (Fed. Cir. 2005). Accordingly, Commerce developed the 15 Day Policy to facilitate timely liquidations.

Commerce also argues that the affected parties bear the burden of enjoining liquidation, citing Agro Dutch Indus. Ltd. v. United States, 29 CIT __, 358 F. Supp. 2d 1293, 1295-96 (2005).[27]

---

[27]Subsequent to the publication in Agro Dutch, the case was dismissed for lack of jurisdiction due to the absence of unliquidated entries, and a motion for reconsideration was

(continued...)

Faced with these competing claims, the court must begin its analysis by determining the degree of deference due to Commerce's statutory interpretation.   Timken Co. v. United States, 26 CIT 1072, 1081, 240 F. Supp. 2d 1228, 1239 (2002)("In the case of statutory interpretations by agencies . . . judicial review must take place within the confines of either Chevron or Skidmore deference.")   Chevron deference should be accorded to agency actions when the statute has failed to speak on an issue and the agency advances an interpretation through formal channels. Chevron, 467 U.S. at 842-45.

As noted above, however, in the matter at issue here, Commerce did not issue its 15 Day Policy through formal notice-and-comment rulemaking procedures.   Nor did it do so in the course of the administrative review or after formal briefing and deliberations. Cf. Mittal Steel Galati, 31 CIT at __, Slip Op. 2007-73 at 11 ("In this case though, Plaintiff challenged Commerce's liquidation instruction policy during the administrative review, and Commerce squarely addressed Plaintiff's claim in the Decision Memorandum.").

---

[27](...continued)
denied.  Agro Dutch Indus. Ltd. v. United States, 29 CIT __, Slip Op. 05-28 (Feb. 28, 2005).  That judgment was reversed and remanded by the Federal Circuit in an unpublished decision.  Agro Dutch Indus. Ltd. v. United States, 167 Fed. Appx. 202 (2006). The Federal Circuit did not address the holding in the initial Agro Dutch case, that plaintiffs are burdened with enjoining liquidation, and that 19 U.S.C. § 1516a(a)(2)(A)(i)(I) does not establish a minimum liquidation period.

Instead, Commerce posted the 15 Day Policy on its website and restated the 15 Day Policy in final decisions published in the Federal Register. In the months and years preceding the announcement of the 15 Day Policy, there was no announcement in the Federal Register stating that this policy was under consideration, or providing for the opportunity for comment. These informal means of establishing policy, albeit in interpreting statutory ambiguity, do not warrant <u>Chevron</u> deference. <u>Cf.</u> <u>United States v. Mead Corp.</u>, 533 U.S. 218, 234 (2001) (describing the informalities of the administrative procedure used in issuing Customs classification rulings such that these rulings are "best treated like interpretations contained in policy statements, agency manuals, and enforcement guidelines, . . . beyond the <u>Chevron</u> pale.")(internal quotations omitted); <u>U.S. Steel Group v. United States</u>, 25 CIT 1046, 1051, 162 F. Supp. 2d 676, 682 (2001). Accordingly, the agency's interpretations are "entitled to respect . . . but only to the extent that those interpretations have the power to persuade." <u>Christensen v. Harris County</u>, 529 U.S. at 587 (citations omitted).

In order to assess whether Commerce's policy is a persuasive interpretation of the statute, the relevant statutory framework must be defined. The 15 Day Policy could be a reasonable and persuasive means of closing the statutory gap in 19 U.S.C. § 1675(a)(3)(B)-(C) if the policy is in accordance with the

statute, consistent with legislative intent, has been properly announced, and is based on the agency's particular expertise. See Mead, 533 U.S. at 228 ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position . . . .").

While Mittal argues that the relevant statutory framework for the 15 Day Policy includes both 19 U.S.C. § 1675(a)(3) and 19 U.S.C. § 1516a(2)(A), the court in Mukand, as noted above, found the 15 Day Policy to be a reasonable and acceptable means of statutory gap-filling by Commerce. Mukand, 30 CIT at __, 452 F. Supp. 2d at 1333-34; see also Mittal Steel Galati, 31 CIT __, Slip Op. 2007-73 at 14. In Mukand, the court explained that 19 U.S.C. § 1675(a)(3) creates obligations for Commerce and Customs regarding the liquidation of entries that inform the analysis of Commerce's 15 Day Policy. Mukand, 30 CIT at __, 452 F. Supp. 2d at 1334.

This court agrees with the statutory analysis in Mukand and Mittal. The scope of 19 U.S.C. § 1516a covers the actions of interested parties, and of the courts reviewing Commerce's completed antidumping administrative reviews. Thus, 19 U.S.C. § 1516a(2)(A) does not prohibit Commerce's action, and Commerce may, but is not required to heed 19 U.S.C. § 1516a in interpreting 19 U.S.C. § 1675(a)(3). Therefore, the relevant statutory

framework for analyzing the 15 Day Policy is 19 U.S.C. § 1675(a)(3). See Turtle Island Restoration Network v. Evans, 284 F. 3d 1282, 1292 (Fed. Cir. 2002)(declining to invoke the doctrine of in pari materia in statutory interpretation).

Moreover, Customs cannot liquidate promptly if Commerce does not issue the instructions in a timely manner. While it is on the outer boundary of reasonableness, the 15 Day Policy encourages prompt liquidation and is therefore consistent with the statutory intent.

Additionally, the intent behind the antidumping statutory framework was to create a more transparent antidumping review procedure and to further the protection of parties' rights through heightened due process. H.R. Rep. No. 103-826(I), at 13 (1994), as reprinted in 1994 U.S.C.C.A.N. 3773, 3785. The 15 Day Policy increases transparency by informing affected parties of Commerce's anticipated timetable for transmitting liquidation instructions to Customs. Commerce also aids due process through the 15 Day Policy by encouraging affected parties to exercise their rights of judicial review in a timely manner. See 19 U.S.C. § 1516a(2)(A). Thus, the 15 Day Policy advances this legislative intent.

Commerce also announced the 15 Day Policy properly and has consistently provided appropriate notice of its intended application. Commerce has regularly restated the 15 Day Policy in either the "Assessment" or "Final Results" published in the Federal

Register.   In the matter at issue here, Commerce gave Plaintiff explicit notice of its intent to apply the policy.   Final Results, 70 Fed. Reg. at 12,653.   Moreover, Commerce's 15 Day Policy had been in place for over two years at the time that Commerce announced that the 15 Day Policy would be applied to Plaintiff in this case.   As such, for purposes of addressing Plaintiff's facial challenge, it does not offend notions of administrative fairness that Plaintiff's goods were liquidated prior to the combined 60-day time period for commencement of an action provided by section 1516a, and prior to the issuance of a preliminary injunction.   Cf. Mukand, 30 CIT at __, 452 F. Supp. 2d at 1333(finding that, as the actual liquidation took place 75 days after the publication of the results, plaintiffs were not harmed in their ability to protect their interests).

Plaintiff claims that it was harmed, in this instance, because it was in the midst of negotiating a preliminary injunction with Commerce when the liquidation instructions were issued. Assuming that Plaintiff's description is accurate, Commerce's behavior is hardly commendable; nonetheless, this fact does not affect the court's analysis of a facial challenge to the 15 Day Policy. Mittal was aware of Commerce's Policy and of Commerce's intention to apply it.   Mittal had other means to protect its interests, including applying for a Temporary Restraining Order, or applying for an injunction immediately without Commerce's consent.   Cf.

Mukand, Appeal Number 2006-1259 (writ of mandamus not granted when parties failed to protect their own interest through pursuit of injunctive relief).[28]

Finally, in adopting its 15 Day Policy, Commerce is acting in an area in which it has substantial expertise. See Pesquera Mares Australes Ltda. v. United States, 266 F. 3d 1372, 1379 (Fed. Cir. 2001) ("Antidumping investigations are complex and complicated matters in which Commerce has particular expertise and thus Commerce's determinations are entitled to deference.")(internal quotation omitted). While, as noted above, Commerce's 15 Day Policy was adopted informally, outside of the administrative review at issue, and is therefore not accorded Chevron deference, its action was within Commerce's area of particular expertise and statutory authority.

Accordingly, Commerce's 15 Day Policy advances a reasonable and – albeit not compellingly – persuasive interpretation of 19 U.S.C. § 1675(a)(3)(B)-(C). The 15 Day Policy fills the statutory

---

[28] While Mittal argues for relief in the nature of an injunction directing Commerce and Customs to reverse the liquidation of Mittal's entries, its filings are devoid of the kind of presentation necessary for such relief. Cf. Canadian Lumber Trade Alliance v. United States, 30 CIT __, 441 F. Supp. 2d 1259, 1263-64 (2006). Accordingly, the court need not decide whether Commerce and Customs in this case acted "so quickly" by liquidating the relevant entries as "to practically foreclose" Mittal "from obtaining judicial review of subject entries pursuant to 19 U.S.C. § 1516a." Mittal Steel Galati, 30 CIT at __, Slip Op. 07-73 at 14-15.

gap in a manner consistent with the statute's language and the legislative intent.  Commerce announced the policy adequately, and based on its own, special expertise.

It is certainly true that a longer period – for issuance of instructions and initiating liquidation by Customs – would be more indicative of Commerce's consideration of all the factors and interests involved in the adoption of its 15 Day Policy. A 15 day policy for the issuance of instructions, with, for example, an instruction to Customs that no liquidation should occur for another 15 days, would be more persuasive and would be more likely to make unnecessary the kind of Temporary Restraining Order practice that Commerce's chosen policy may engender.  Nonetheless, the court cannot conclude that Commerce's policy is unworthy of <u>Skidmore</u> deference.  Accordingly, Mittal's challenge fails and the court will not order re-liquidation.

## Conclusion

For the foregoing reasons, the court **affirms-in-part and remands-in-part** Commerce's determinations, and **denies** Plaintiff's Motion for Judgment on the Agency Record.  Remand results are due by October 1, 2007.  Comments are due by October 22, 2007.  Reply comments are due by November 1, 2007.  SO ORDERED.

                              _____/s/_____
                              Donald C. Pogue, Judge


Dated:    July 18, 2007
          New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____        By: _____
                                              Deputy Clerk